UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NUMISMATIC GUARANTY CORPORATION OF AMERICA,<br><br>              Plaintiff,<br><br>-against-<br><br>CITY GOLD USA, INC., CITI GOLD REFINING INC., MURDAKHAY ILYAYEV a/k/a MIKHAIL ILYAYEV, YURI RAFAILOV, BUKHOR FATAKHOV, IGOR FATAKHOV, and Does 1-10,<br><br>              Defendants. | Docket No.<br><br>**COMPLAINT** |

Plaintiff NUMISMATIC GUARANTY CORPORATION OF AMERICA, for its Complaint in this action, hereby alleges upon information and belief the following:

## THE PARTIES

1. Plaintiff NUMISMATIC GUARANTY CORPORATION OF AMERICA ("NGC") is a Florida Corporation with principal place of business in Sarasota, Florida.

2. Defendant CITY GOLD USA, INC. is a New York corporation with principal place of business in New York, New York.

3. Defendant CITI GOLD REFINING, INC. is a New York corporation with principal place of business in New York, New York.

4. Defendant MURDAKHAY ILYAYEV aka MIKHAIL ILYAYEV ("Ilyayev") is a natural person residing in Rego Park, New York.

1

5. Defendant YURI RAFAILOV ("Rafailov") is a natural person residing in Rego Park, New York.

6. Defendant BUKHOR FATAKHOV ("Bukhor") is a natural person residing in Rego Park, New York.

7. Defendant IGOR FATAKHOV ("Igor") is a natural person residing in Rego Park, New York.

## JURISDICTION AND VENUE

8. The amount in controversy in this action exceeds the sum of $75,000.

9. This Court has original jurisdiction of Plaintiff's federal claims under 18 U.S.C. §1964(c), 28 U.S.C. §§1338(a) and (b), and 28 U.S.C. §§1331, and pursuant to 28 USC §1332(a)(2), as a dispute between citizens of different states. This Court has supplemental jurisdiction over Plaintiff's New York statutory and common law claims pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

10. Venue is proper in this Judicial District under 18 U.S.C. §1965(a), 15 U.S.C. §2102, and 28 U.S.C. §1391(b) because the corporate defendants are incorporated in New York and headquartered in this District, all Defendants transact their affairs and do business in this District, and a substantial portion of the events, omissions and property which is the subject matter of this action are located in this District.

11. This Court has personal jurisdiction over any non-domiciliary Defendant pursuant to CPLR §302(a) because all such defendants transacted business in New York, contracted to supply goods and services in New York, committed a tortious act in New York and (i) regularly does and solicits business, engages in persistent course of conduct and derives substantial

revenue from services rendered in New York or (ii) expects or should reasonably expect the tortious act to have consequences in New York and derives substantial revenue from interstate commerce.

**FACTS**

12. NGC is one of the leading rare coin authentication and grading services in the world, having graded over 39 million coins since its inception in 1987.

13. NGC authenticates and grades coins for coin dealers and collectors according to NGC's standards as interpreted and applied by experts employed by NGC as graders. The coins are graded on a 1-70 scale, with a 70 signifying perfect (mint state) condition.

14. Once a coin has been authenticated and graded, NGC places the coin in a sealed, tamper-evident hard plastic holder along with a paper insert which bears NGC's name and logo, a description of the coin including the grade assigned by NGC on a 1-70 scale, and a unique NGC certification number and bar code relating to the particular coin. NGC maintains an on-line database of NGC-certified coins classified according to NGC certification numbers, so that anyone viewing an image of an NGC-certified coin can check whether the certification number appearing on the paper insert is the correct number assigned by NGC to that coin.

15. Coins that have been artificially altered to look like a different coin, e.g., a coin that is rarer or in better condition than the unaltered coin, are considered "not genuine" and NGC refuses to grade such coins.

16. Third party authentication and grading is an invaluable part of the rare coin marketplace because it allows people to buy and sell coins without debate over the authenticity or quality of a coin, or the delay of seeking a second opinion on a coin before purchase. Certified coins trade at a premium above uncertified coins, and NGC certified coins trade at the highest

premium due to NGC's position as one of the oldest and most well-established grading services in the industry.

17. NGC guarantees that any coin in an NGC holder is genuine and has been properly graded. Owners of NGC-graded coins which are found to be counterfeit or improperly graded may submit those coins to NGC for reimbursement of any difference in value arising from NGC's error. NGC certified coins are easier to sell, even at high prices, than uncertified coins because a prospective buyer of a coin can trust the expert graders at NGC and know his/her investment in the coin is secured financially by the NGC Guarantee.

18. In order to submit a coin for certification by NGC, the submitter must open an NGC submitter account. Dealers and significant collectors apply for NGC submitter accounts through an application that includes references. Defendant City Gold USA, Inc. ("City Gold") created an NGC Authorized Dealer submitter account, naming Defendant Ilyayev as the contact individual, and listing Defendant Rafailov, who is also an NGC submitter through a personal collector account, as one of four references. In filling out the City Gold USA application, Ilyayev signed a Terms and Conditions sheet including the following provision:

> 5. The Authorized Dealer shall indemnify and hold NGC and its affiliates, and all of its and their respective employees, officers, directors and agents, harmless from and against all claims, liabilities, and expenses (including reasonable attorney's fees) relating to or arising under this Application Form and Agreement (including these Terms and Conditions) and the transactions contemplated hereunder, except to the extent finally judicially determined to have resulted primarily from the bad faith or intentional misconduct of NGC.

19. After an Authorized Dealer or collector NGC submitter account is created, the submitter fills out an additional submission account every time they submit coins to NGC for certification and grading. The NGC submission form requires the submitter to represent what each of the coins submitted for certification is.

20. Commencing in 2015 and continuing as of the date of this Complaint, Defendants have engaged in a criminal scheme to profit from the purchase, alteration with counterfeit markings, and resale of rare coins. The scheme involves (1) purchasing genuine Eighteenth Century gold coins that are not particularly rare ("the Source Coins"); (2) fraudulently altering the Source Coins with fake "signatures" of Eighteenth Century goldsmiths to make them appear to fall within a significantly rarer sub-category of coins (the "Altered Coins"); (3) fraudulently misrepresenting the true nature of the counterfeit markings on the Altered Coins to NGC to obtain erroneous certifications; and (4) selling the certified Altered Coins to coin collectors for huge profits.

*Defendants*

21. City Gold USA and Citi Gold Refining share the business address of 20 West 47th Street, Booth 30, New York, NY, 10036.

22. Ilyayev is the only officer listed for City Gold USA and signed the City Gold USA application to become an NGC submitter. Ilyayev purchased coins from Heritage Auctions (the world's leading rare coin auctioneer), including the Source Coins, using a Heritage Auctions bidder account in his and City Gold USA's name, and providing the City Gold USA business address and New York State sales tax certificate of authority number.

23. Rafailov purchased coins from Heritage Auctions, including the Source Coins, using a Heritage Auctions bidder account in his and City Gold USA's name – a different bidder account from Ilyayev's – and providing the City Gold USA business address and New York State sales tax certificate of authority number. Rafailov paid for these coins using City Gold USA funds. Some of the Source Coins bought through Rafailov's bidder account were altered

with counterfeit markings and then submitted to NGC for grading using the City Gold USA/Ilyayev submitter account.

24. Ilyayev signed checks from a checking account in the name of City Gold USA to pay for purchases made by both him and Rafailov. Ilyayev submitted to NGC Altered Coins that were bought by either Rafailov or himself.

25. Ilyayev has sold Altered Coins to third parties, both before and after acquiring NGC certification for the Altered Coins. Ilyayev has been paid personally for Altered Coins Ilyayev sold to third parties.

26. Bukhor is an officer listed for Citi Gold Refining.

27. Igor has been paid by third party collectors upon purchase of Altered Coins that Ilyayev sold.

*Regulated Gold Coinage*

28. Regulated coins are a valuable subset of coins from the late-Eighteenth Century. Before the United States Mint was established in 1792, the U.S. relied upon foreign coins to facilitate commerce. This continued until foreign coins were finally removed from U.S. legal tender status by the Coinage Act of 1857. The early U.S. Congresses passed statutes assigning U.S. Dollar values to the legal tender coins of foreign governments based on their weights. Gold coins from Brazil, Portugal, Spain (and its territories), France and England were commonplace in the U.S., but the coins' weights were unreliable. This presented challenges for merchants and other citizens who could not ascertain the exact weight and, therefore, actual value of their coins.

29. Prominent American private goldsmiths offered a solution; they weighed the foreign gold coins that were in circulation and made any adjustments necessary for them to conform to local standards. A "plug" of extra gold would be added to underweight coins and an

overweight coin would be holed or clipped to remove the excess gold. The goldsmith would then "sign" the coin by pressing or stamping his own hallmark (also called "countermarks" or "counterstamps"), usually his initials into the face of the coin to signify that he had verified and/or corrected the weight. These hallmarked coins were thereby "regulated" by early American goldsmiths. Merchants and the general public trusted the goldsmiths' reputations, and regulated coins were more easily circulated in the U.S. than unregulated foreign coins.

30. Regulated coins are scarce today because most were removed from circulation and melted down as the U.S. Mint started producing coins using different weight standards. As a result, the foreign coins assumed fractional values in U.S. Dollars and were otherwise made obsolete. Today these coins are valued as interesting and historically significant pieces, and they routinely command prices in excess of $100,000 each. In comparison, unregulated foreign coins of the same time period and quality may be bought for less than $5,000.

31. One of the coins at issue in this case was purchased by Defendants as an unregulated Chilean coin for $2,115 in April 2016. After Defendants altered the coin and acquired NGC certification, Defendants sold it as a regulated coin for $141,000 in August 2017.

*Defendants' Conspiracy*

32. Upon information and belief, Defendants have manufactured and are using imitations of the countermarks of some of the most famous American goldsmiths: Ephraim Brasher ( whose hallmark was "EB"), John Burger ("B"), Joseph Richardson, Sr. ("IR"), Myer Myers ("MM"), Lewis Fueter ("LF" and "F&G"), and Richard Humphreys ("RH").

33. Defendants are buying unregulated Source Coins and are altering them with counterfeit markings to pass them off as more valuable coins.

34. Defendants Rafailov and Ilyayev each have bidder accounts with Heritage Auctions (the "Rafailov Account" and the "Ilyayev Account"). Both accounts identify "City Gold USA, Inc" as their business and use the same address and tax information. Ilyayev is registered as the principal officer of City Gold USA, Inc.

35. The Altered Coins were purchased in their unaltered form at Heritage auction sales through both the Rafailov Account and Ilyayev Account. Payments for the Source Coins purchased under both of the Heritage accounts were made in part using a checking account under the name of City Gold USA, Inc., and the relevant checks were signed by Ilyayev.

36. Rafailov and Ilyayev usually had Heritage ship the Source Coins to the City Gold USA address in New York, often through the United States Postal Service ("USPS"). City Gold USA shares the same address as Citi Gold Refining. The sign at the location shared by both companies is "Citi Gold Refining, Inc."

37. Upon receiving the Source Coins, Defendants clipped and/or plugged the coins in the manner typical to what each regulator did to achieve the correct weight. Defendants then use jewelers' tools and dies to impress counterfeit countermarks on the Source Coins so that they can be passed off as much more valuable regulated coins.

38. Once the Source Coins were clipped/plugged and impressed with the counterfeit countermarks, Defendant City Gold USA, using its individual contact, Ilyayev, submitted the Altered Coins to NGC to achieve certification as authentic regulated coins. Approximately five of these submissions (containing 10 to 12 Altered Coins in total) were made by using US mail shipments. City Gold USA/Citi Gold Refining mailed the Altered Coins from their address in New York to the NGC offices in Florida via USPS.

8

39. Defendants did not disclose to NGC that the Altered Coins had been altered with the counterfeit markings. In filling out the NGC submission forms for the Altered Coins, Defendants represented the coins as genuine regulated coins using terms and abbreviations standard in the numismatic industry.

40. Defendants paid NGC for its services using a credit card.

41. After fraudulently obtaining NGC's certification for the Altered Coins, Defendants sold the Altered Coins directly to coin collectors worldwide through the Citi Gold Refining New York location, eBay, and by consignment through Stacks Bowers auction house. The Stacks Bowers auction sales of Altered Coins to date have occurred in New York and Colorado.

42. In at least one case, after a specific buyer purchased the certified Altered Coins, Defendants contacted the buyer directly to sell additional Altered Coins, including ones that had not yet been certified. Ilyayev instructed these collectors to make payments to various defendants, including himself and Igor personally, for various sales of Altered Coins.

43. Defendants have sold to collectors at least 10 of the Altered Coins that had not previously been submitted to NGC for grading.

44. One collector who purchased the Altered Coins submitted the uncertified Altered Coins to NGC for grading.

45. Defendants submitted 25 of the Altered Coins to NGC between January 2015 and December 2017, and in December 2017 NGC received 10 additional Altered Coins from a collector, for a total of 35 Altered Coins known to NGC. Of these coins with counterfeit markings fraudulently submitted to NGC, 26 were, in error, certified as genuine regulated coins

when they were submitted. The remaining nine Altered Coins were submitted in December 2017 – five by Defendants and four by a collector – and have not been certified.

46. In December 2017, a new team of graders at NGC saw the nine Altered Coins that were pending certification and determined that the countermarks on the Altered Coins contained certain unique anomalies that cannot be found in the countermarks of any coin not associated with Defendants. NGC concluded that these countermarks were counterfeit. For example, the Burger hallmark is an elaborate "B" punched within a circle with a pronounced tip extending above the cross bar over the top loop of the B. Each of Altered Coins bearing a counterfeit Burger countermark does not have a pronounced tip. See below an image of the Defendants' Burger countermark (left) compared to the Burger countermark seen on coins unconnected to Defendants (right).

 

47. The Brasher hallmark is an "EB" punched within an oval. On the genuine hallmark, the interior space of both loops is the same size. By contrast, the Altered Coins have a slightly misshapen "B" in the "EB," where the interior loop of the top half of the B is wider than the bottom. No genuine Brasher countermarked coin contains the misshapen B, however all 20 of the Altered Coins with a counterfeit Brasher hallmark have a misshapen B. See below an image of the Defendants' Brasher countermark (left) compared to the Brasher countermark seen on coins unconnected to Defendants (right).

 

48. NGC re-examined the previously-certified Altered Coins and identified the coins in their unaltered forms (the "Source Coins") from Heritage Auctions' past auction sales records, which are available with high resolution photographs at Heritage's website, www.HA.com. Heritage has since confirmed the Source Coins were all purchased through the Rafailov and Ilyayev Accounts as alleged above.

49. NGC's experts could identify the Source Coins and Altered Coins as being the same based on a number of unique wear markings and anomalies of the individual coins.

50. For example, below are comparison images of one of the Altered Coins, a Chilean Ferdinand VI gold 8 Escudos 1756/5 coin. The above images show the obverse (front or face) and reverse (back) of the Source Coin as it was sold by Heritage Auctions. The below images show the obverse and reverse of the coin when it was submitted to NGC for certification as a Brasher and Burger regulated coin. Note circled in red the four unique contact points on this coin that allow for identification: the four petal flower counterstamp behind the shoulder of the bust at 9:00 and two dot contact marks near the "A" on the face of the coin, and the void (depression) at 2:00 and small rim bump at 5:00 on the back of the coin.



51.     This Source coin was sold by Heritage Auctions on April 14, 2016 for $2,115 to the Rafailov Account, which paid for the Source Coin using a City Gold USA, Inc. check signed by Ilyayev, and delivered to the address shared by City Gold USA and Citi Gold Refining. Two months later, this coin was submitted to NGC via USPS for certification as a coin that was regulated by Ephraim Brasher and John Burger. In the two months between buying the Source Coin and submitting the Altered Coin for certification, Defendants had clipped off part of the lower edge of the coin to correct its weight, and stamped the coin with the Burger and Brasher

hallmarks in the locations that the two goldsmiths usually stamped their coins. In August 2017 this Altered Coin was featured in a Stacks Bowers sale and sold for $141,000.

52. Defendants have sold at least twenty-one of the Altered Coins with counterfeit markings, and are continuing to sell the remaining Altered Coins in their possession to collectors in New York and/or by mail nationwide.

53. Defendants knew that getting certain coins certified by NGC would be enough to deceive purchasers into believing the Altered Coins were genuine. Defendants first intentionally deceived NGC regarding the authenticity of the Altered Coins. Defendants then intentionally deceived collectors by selling them the Altered Coins that they knew were NGC-certified in error, knowing NGC would be damaged when those coins were returned under the NGC Guarantee.

*Ongoing Damage to Plaintiff*

54. The Source Coins were purchased by Defendants at Heritage Auctions for $400 – $5,000 each. The Altered Coins with NGC certification were sold at public auction for $80,000 – $150,000 each. The Altered Coins are actually worthless due to Defendants' permanent defacement of them. NGC may be liable to third parties buying the Altered Coins under its Guarantee, in which it agrees to reimburse buyers the prices paid for erroneously NGC-certified coins that are not genuine.

55. NGC has an interest in identifying and recovering all of the fraudulently certified Altered Coins that remain in Defendants' possession before Defendants sell them to unsuspecting third parties.

56. NGC also has an interest in identifying the Altered Coins that have already been sold to third parties in order to notify the current owners and "buy" back the coins under the

NGC Guarantee. If NGC cannot prevent further sales, it may ultimately be liable for the higher resale prices paid by later purchasers.

57. By reason of the foregoing unlawful acts, Defendants have caused, and are continuing to cause, substantial and irreparable damage and injury to NGC and to the public. Defendants have benefited from such fraudulent conduct and will continue to carry out and be unjustly enriched by such fraudulent conduct unless enjoined by this Court.

## COUNT ONE -- RICO

58. NGC repeats and realleges each and every allegation contained in Paragraphs 1-57 hereof as though set forth in full here.

59. Defendants are "persons" associated with one another as an "enterprise" engaged in, or the activities of which affect, interstate commerce in the meaning of 18 U.S.C. §1961.

60. Defendants' activities constituted a "pattern of racketeering activity" in the meaning of 18 U.S.C. §1962 in that they violated 18 U.S.C. §1341 (mail fraud) and 18 U.S.C. §1343 (wire fraud).

61. Defendants' activities constitute a pattern of racketeering activity under 18 U.S.C. § 471 because they, on multiple occasions and with an intent to defraud, falsely made, forged, counterfeited, or altered any obligation or other security of the United States. The Altered Coins, as a previous form of U.S. currency, are obligations or other security of the United States.

62. Defendants' activities also constitute a pattern of racketeering activity under 18 U.S.C. § 1961 because, under 18 U.S.C. § 1957, Defendants engaged in multiple monetary transactions in property derived from specified unlawful activity.

63. The Altered Coins were fraudulently submitted to NGC for certification, which assisted in the sale of the Altered Coins to third party collectors for in excess of $80,000 each.

64. Defendants invested the income, or the proceeds of income, derived from their pattern of racketeering activity into an enterprise in violation of 18 U.S.C. §1962(a).

65. Defendants' enterprise is comprised of City Gold USA, Inc., Citi Gold Refining Inc., Ilyayev, Rafailov, Bukhor, Igor, and others unknown at this time.

66. Defendants acquired or maintained, directly or indirectly, an interest in or control of an enterprise through their pattern of racketeering activity in violation of 18 U.S.C. §1962(b).

67. Defendants were and are employed by or associated with an enterprise and conduct or participate, directly or indirectly in the conduct of the enterprise's affairs through their pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

68. Defendants conspired to violate 18 U.S.C. §1962(a), (b), and (c).

69. By reason of Defendants' unlawful acts as described above, Plaintiff has been injured in its business or property within the meaning of 18 U.S.C. §1964(c) in an as yet unascertained amount, but exceeding $1,000,000.

**COUNT TWO – VIOLATION OF HOBBY PROTECTION ACT**

70. NGC repeats and realleges each and every allegation contained in Paragraphs 1-69 hereof as though set forth in full here.

71. During the past four years Defendants have sold rare coins which are counterfeits of "original numismatic items" as that term is defined in the Hobby Protection Act, 15 U.S.C. §2101 et seq., and its corresponding regulations located at 16 C.F.R. §304.1 et seq.

72. Defendants continue to sell rare coins which are counterfeits of "original numismatic items" as that term is defined in the Hobby Protection Act, 15 U.S.C. §2101 et seq., and its corresponding regulations located at 16 C.F.R. §304.1 et seq.

73. The Altered Coins that were sold were at no point marked "COPY" in accordance with the Hobby Protection Act and accompanying regulations.

74. NGC is an "interested person" for purposes of 15 U.S.C. §2102, by virtue of the fact that Defendants have submitted the Altered Coins to NGC for certification, and some of the coins Defendants sold to collectors at auction bore fraudulently obtained NGC certifications.

75. NGC is entitled to an injunction against further violations of the Hobby Protection Act and regulations, as well as its costs and attorney's fees in this action.

## COUNT THREE – COMMON LAW FRAUD

76. NGC repeats and realleges each and every allegation contained in Paragraphs 1-75 hereof as though set forth in full here.

77. Defendants purchased Source Coins valued at $800 to $5000 and then intentionally altered the Source Coins by adding counterfeit countermarks and clipping and plugging parts of the Source Coins to create the Altered Coins, which were erroneously valued in excess of $80,000.

78. Defendants knowingly submitted coins with counterfeit countermarks to NGC.

79. Defendants represented, in signing the Terms and Conditions of the Submitter Agreement, that they would not submit counterfeit or altered coins to be certified.

80. Defendants, at no point, informed NGC that they had altered the Source Coins in creating the Altered Coins.

81. Defendants represented the coins as regulated using terms and abbreviations standard in the numismatic industry.

82. Defendants intended that NGC would rely on its representations and grade the Altered Coins under the assumption that they were authentic.

83. NGC reasonably relied upon Defendants' statements and omissions in certifying the Altered Coins, to its detriment.

84. By reason of Defendants' unlawful acts and omissions as described above, Plaintiff has been currently damaged in an amount exceeding $1,000,000. Plaintiffs' total damages are as yet unascertained because Defendants have not been enjoined from carrying out further fraudulent sales.

85. In acting as set forth herein, Defendants acted willfully, fraudulently, maliciously, and in wanton disregard of NGC's rights. Therefore, NGC seeks exemplary damages from Defendants.

### COUNT FOUR – DECEPTIVE PRACTICES (N.Y. GEN. BUS. LAW §349)

86. NGC repeats and realleges each and every allegation contained in Paragraphs 1-85 hereof as though set forth in full here.

87. Defendants' aforesaid acts constitute deceptive acts or practices in the conduct of a business in New York under N.Y. Gen. Bus. Law §349.

88. Unless enjoined by this Court, Defendants will continue to engage in deceptive acts or practices by continuing to sell Altered Coins to unknowing collectors.

89. NGC has been injured by reason of Defendants' violations as described above and has sustained damages in an as yet unascertained amount, but exceeding $1,000,000.

90. In acting as set forth herein, Defendants have acted willfully, fraudulently, maliciously, and in wanton disregard of NGC's rights and in seeking to defraud consumers looking to buy rare coins. Therefore, NGC seeks exemplary damages from Defendants in an amount according to proof at trial. NGC further seeks its attorney's fees as provided in N.Y. Gen. Bus. Law §349.

## COUNT FIVE – BREACH OF CONTRACT

91. NGC repeats and realleges each and every allegation contained in Paragraphs 1-90 hereof as though set forth in full here.

92. Defendant City Gold USA, and its employees, officers and agents (the remaining Defendants) are bound by the Terms and Conditions of the NGC submitter application signed by Ilyayev.

93. In the submitter application, Defendants described each coin as though it were an authentic, unaltered coin.

94. Defendants submitted the Altered Coins to NGC, knowing that the countermarks had been added and the coins were not genuine, regulated coins under NGC's grading policies.

95. Defendants sold NGC-certified coins to third parties knowing the Altered Coins were not genuine and that the third parties would pursue NGC under the NGC Guarantee once the coins' fraudulent alterations were discovered.

96. Under the Terms and Conditions, Defendants "shall indemnify and hold NGC and its affiliates, and all of its and their respective employees, officers, directors and agents, harmless from and against all claims, liabilities, and expenses (including reasonable attorney's fees) relating to or arising under this Application Form and Agreement (including these Terms and Conditions) and the transactions contemplated hereunder, except to the extent finally judicially determined to have resulted primarily from the bad faith or intentional misconduct of NGC."

97. Pursuant to the Terms and Conditions, Defendants are bound to indemnify and hold NGC harmless of all liabilities, claims and expenses incurred as a result of any individual's claim under the NGC Guarantee regarding the Altered Coins.

98. By reason of Defendants' unlawful acts as described herein, Plaintiff has been damaged in an amount exceeding $1,000,000, to be proven at trial.

## COUNT SIX – CONSPIRACY

99. NGC repeats and realleges each and every allegation contained in Paragraphs 1-98 hereof as though set forth in full here.

100. Defendants agreed to fraudulently alter coins, submit them to NGC for certification, and re-sell them as genuine, in violation of the various statutory and common law rules set forth above.

101. Defendants have committed various overt acts in furtherance of this agreement, including but not limited to purchasing the Source Coins, purchasing or manufacturing the equipment required to create the Altered Coins, impressing a counterfeit countermark on the Source Coins, clipping/plugging the Source Coins, submitting the Altered Coins to NGC via the mail and otherwise, paying for NGC's certification via credit card, and selling the Altered Coins to third party collectors.

102. By reason of Defendants' unlawful acts as described herein Plaintiff has been damaged in an amount according to proof at trial.

**WHEREFORE**, NGC prays for judgment against Defendants as follows:

1. That Defendants, their agents, servants, employees, successors, assigns and all those controlled by them, be permanently enjoined from submitting coins to NGC for certification, either directly or through a third party, which were altered fraudulently as defined herein;

2. That Defendants be ordered to deliver for destruction all altered coins in their possession which have been placed in NGC holders, including the NGC coin inserts and holders;

3. That Defendants be ordered to account for and pay over to NGC all gains, profits and advantages derived by them from their submission of altered coins to NGC and/or from any other unlawful conduct as described herein;

4. That Defendants be ordered to pay all damages sustained by NGC, or, alternatively, provide restitution and disgorge profits, resulting from Defendants' acts of unfair trade practices and unfair competition;

5. That Defendants be ordered to pay to NGC a sum equal to three times the amount of NGC's actual damages as provided by 18 U.S.C. §1964(c);

6. That Defendants be ordered to pay to NGC exemplary damages according to proof;

7. That Defendants be ordered to pay NGC's costs of this action, including reasonable attorney's fees; and

8. That the Court grant NGC such other and further relief as the Court deems just.

Dated: April 27, 2018

/s/ Thomas P. Battistoni_____
Counsel for Plaintiff

Thomas P. Battistoni (TB8012)
Brittany H. Sokoloff (BR8489)
Schiff Hardin LLP
666 Fifth Avenue, 17th Floor
New York, NY 10103
tbattistoni@schiffhardin.com
bsokoloff@schiffhardin.com

Armen R. Vartian (AV4124)
Laura C. Tiemstra (pro hac vice application to be filed)
Law Offices of Armen R. Vartian
1601 N. Sepulveda Blvd. #581
Manhattan Beach, CA 90266
(310) 372-1355 phone
(866) 427-3820 fax
armen@vartianlaw.com
laura@vartianlaw.com